IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| MANUEL BAEZ, | ) |
| | ) |
| Plaintiff | ) 1:20-CV-00148-RAL |
| | ) |
| vs. | ) RICHARD A. LANZILLO |
| | ) Chief United States Magistrate Judge |
| C/O FROELICH, LT. BEDNORO, | ) |
| | ) MEMORANDUM OPINION ON |
| | ) DEFENDANTS' MOTION FOR SUMMARY |
| Defendants | ) JUDGMENT |
| | ) |
| | ) ECF NO. 107 |
| | ) |

MEMORANDUM OPINION

## I.     Introduction

Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 is pending

before the Court.  ECF No. 107.  For the reasons explained below, the motion will be

GRANTED in part and DENIED in part.  The motion will be DENIED as to Plaintiff's Eighth

Amendment deliberate indifference to serious mental health needs claim asserted against

Defendant Froelich.  The motion will be GRANTED as to the Eighth Amendment excessive

force claim asserted against Defendant Bednoro.

## II.     Procedural History

The procedural history of this case prior to the filing of the instant motion is set forth in

the Court's Memorandum Opinion on Defendants' motion to dismiss Baez's amended complaint.

ECF No. 100, pp. 2-3.

1

In summary, Plaintiff Manuel Baez ("Baez") commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against eleven employees of the Pennsylvania Department of Corrections, including State Correctional Institution at Albion ("SCI-Albion") Corrections Officer ("C/O") Froelich and Lt. Bednoro, on June 9, 2020. The complaint asserted violations of Baez's First and Eighth Amendment rights under the United States Constitution, as well as a supervisory liability claim and several unspecified claims.[1] ECF No. 8. Defendants moved to dismiss all claims pursuant to Rule 12(b)(6). ECF No. 58. The Court denied the motion as to Baez's Eighth Amendment deliberate indifference to mental health needs claim against Froelich and his excessive force claim against Bednoro and granted the motion as to all other claims, dismissing those claims without prejudice and with leave to file an amended complaint. ECF Nos. 78, 79. Thereafter, Baez filed a verified amended complaint (ECF No. 86),[2] and Defendants again moved for dismissal pursuant to Rule 12(b)(6) (ECF No. 90); however, Defendants did not challenge the Eighth Amendment deliberate indifference and excessive force claims asserted against Froehlich and Bednoro. The Court granted this motion, and all challenged claims were dismissed with prejudice.[3] ECF No. 100, 101.

After discovery concluded, Froehlich and Bednoro filed the instant motion for summary judgment as to the remaining claims in the case. ECF No. 107. Pursuant to Local Rule LCvR

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and it can exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1337. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636. *See* ECF Nos. 40, 55.

[2] The exact claims asserted in this amended complaint, as well as the Defendants named, are detailed in the Court's Memorandum Opinion on Defendants' motion to dismiss the amended complaint. ECF No. 100.

[3] The Court had already dismissed certain claims "[b]ased on the filing of the Amended Complaint and the colloquy with Baez during" an October 18, 2021 "status conference" before issuing its Memorandum Opinion and Order on Defendants' motion to dismiss Baez' amended complaint, as detailed in the Memorandum Opinion. ECF Nos. 88, 100, 101.

56(C), Froehlich and Bednoro accompanied their motion with a brief (ECF No. 108), a concise statement of material facts (ECF No. 109), and an appendix of Exhibits A-J (ECF No. 110), which includes handheld camera footage of incidents that occurred on March 7, 2020, and March 8, 2020 – incidents central to Baez's claims. ECF No. 110-2 (Exhibit B). Baez then filed several documents and exhibits that the Court construed as a response in opposition to the motion for summary judgment and supplements to this response. ECF Nos. 119, 119-1, 120, 120-1, 121, 121-1. In accordance with LCvR 56(C), Baez also filed a responsive concise statement of material facts. ECF No. 129.

Baez's two remaining claims in this action both assert Eighth Amendment violation. He claims that Froelich acted with deliberate indifference to mental health needs and that Bednoro used excessive force against him. ECF No. 86, p. 1, ¶ 1. Defendants have moved for summary judgment on the grounds that Baez did not properly exhaust his administrative remedies as to either of his two remaining claims and, alternatively, the record is insufficient to sustain either claim.

### III.    Material Facts

On April 21, 2019, Baez was placed in the Restricted Housing Unit ("RHU") at SCI-Albion, where he was incarcerated at that time. Throughout the events giving rise to this action, Baez remained in the RHU and rarely left his RHU cell. Baez was also on a permanent razor restriction "for health and safety security reasons," and had "a permanent razor restriction door tag" on his RHU cell door. ECF No. 119, p. 2.

Baez alleges that, despite this restriction, Officer Froelich, who worked in the RHU, allowed him to use a razor because they had "bec[ome] cool." ECF No. 86, p. 3, ¶ 1. However, upon learning why Baez was in prison, Froelich said to Baez, "[i]f he had 30 to 60 years he'[d]

3

kill himself." *Id.* Froelich allegedly made similar comments to Baez encouraging him to commit suicide, and after about a week, gave Baez a razor and said, "You killed that poor old man you should kill yourself.'" *Id*; ECF No. 119, p. 2.

On the morning of March 7, 2020, a security officer conducting rounds in the RHU determined that the light in Baez's cell was improperly covered and ordered him to remove the obstruction. Baez refused, prompting several more orders. Baez ultimately complied; however, he refused the subsequent orders to be handcuffed so that Lt. Bednoro could clear his cell of paper, linens, and a mattress. According to Defendants, "Baez was verbally abusive towards staff and made sexual comments and gestures." ECF No. 108. Baez concedes only that "Lt. Bednoro kept being a bully, so [he] verbally disrespected him." ECF No. 129, ¶ 2. Bednoro and the other officer then left, and Bednoro returned shortly after with a compliance team "consist[ing] of CO1 Ritchey with the pinning shield, CO1 Cruz with handcuffs and keys, CO1 Baker with the OC spray, and CO1 Giroux with the camera to record the incident." ECF No. 108, ¶6.

The parties disagree over what happened next. Baez asserts that "Lt. Bednoro order four OC Spray [sic] back to back in dangerous amounts." ECF No. 129, ¶ 3. Defendants maintain that first "[Baez] was counseled by Defendant Bednoro and other staff to turn around in order to be handcuffed, but [he] continued to berate the officers and refused to comply with their orders." ECF No. 109, ¶ 7. Bednoro only then ordered the OC Spray, which was sprayed "into the cell in a two to three second burst." *Id.*, ¶ 9. After "several moments passed" without any change in Baez's behavior, Bednoro gave him "several more orders to report to the front of the cell to be handcuffed, which were all refused," prompting the administration of "[a] second two-three burst of OC Spray." *Id.*, ¶¶ 9-10. Again, Defendants maintain that Baez received "several orders to

4

report to the front of the cell to be handcuffed, and all refused," at which point "[a] third two to three second burst of OC spray was directed and orders were given." *Id.*, ¶ 11. A review of the handheld camera footage confirms that Bednoro ordered Baez to come to the front of his cell and "cuff up" before introducing the OC spray, that he gave Baez several opportunities to comply with this order between each burst of OC spray, and that he ordered a total of three bursts of OC spray, each of which lasted between two and three seconds. ECF No. 110-2, 4:30-7:37.

Baez was then taken to medical, where he had his vitals checked and eyes rinsed out before being medically cleared. Next, he "was escorted to the RHU strip search room without incident, where he complied with a strip search and then was placed in a tamper resistant smock." ECF No. 109, ¶ 13. Baez was then returned to his cell, which he claims had neither been cleaned nor decontaminated. ECF No. 129, p. 2. Defendants assert that the cell "had been cleared out, cleaned, and searched by staff," and that "the air purging system was run for thirty minutes." ECF No. 109, ¶ 14. The handheld camera footage shows that Baez was taken back to his cell twelve minutes after he was brought to medical, but it does not shed light on the condition of the cell upon his return. ECF 110-2, 8:09, 20:46 (time Baez was removed and returned to cell).

The following day, "March 8, 2020, CO1 Snippert was conducting a security round" when "he observed [Baez] cutting his chest with a piece of a broken razor blade." ECF No. 109, ¶¶ 16, 17. Snippert ordered Baez to stop cutting himself, but he refused. Snippert then "opened the feeding aperture and applied a burst of OC spray into the cell for three to five seconds which obtained its desired effect and [Baez] ceased cutting himself." *Id.*, ¶ 20. Snippert and another officer then handcuffed Baez, who was still wearing a tamper resistant smock, and took him to medical.

5

Defendants assert that while Baez was receiving treatment, he said that he cut himself because he was stressed out and that he identified Snippert as the officer who had given him the piece of razor. Baez does not deny this assertion, but counters that he merely "misidentif[ied] C/O Snippert to C/O Froelich because they look alike," and he asserts that "[he] got the razor from C/O Froelich, and not C/O Snippert." ECF No. 129, p. 2. He adds that "[he] was under deep stress and ha[d] not slept in 24 hours due to [his] body being on fire from the March 7, 2020, spray." *Id.*

The handheld camera footage captured the conversation among Baez, a nurse, and corrections officers on March 7, 2020, while Baez was receiving medical treatment for his cut and the OC spray. The nurse asked Baez why he cut himself, but he did not answer her. ECF No. 110-2, 4:29-34. Shortly thereafter, however, Baez turned his head towards Snippert, and, with his eyes closed, asked, "why you spray if I wasn't posing a threat towards you, I asked you for help, you told me to back up, I backed up, and you sprayed me?" *Id.*, 6:30-33." He then said, "I said, yo, I'm stressed out, I'm cut up, and you said back up, and I backed up, that makes no sense to me, I'm human man, I'm stressed out, I'm going through a lot, and you sprayed me." *Id.*, 6:49-7:28. Snippert did not respond. Baez, with his eyes still closed, then turned to Capt. Johnson, who was not visible on screen, and, after detailing the March 7, 2020, incident, told him that he was "stressed out because of [his] whole situation." *Id.*, 10:00. In response, Capt. Johnson asked "where'd you get the piece of razor from?" *Id.*, 12:15. Four seconds later, Baez, with eyes still closed, said "from him" and nodded his head in Snippert's direction. *Id.*, 12:21. Johnson then asked, "He gave it to you?" Baez responded: "the one who sprayed me, he gave it to me when he passed out the brown bag of food." *Id.*, 12:21-25. Johnson then said, "Okay," but about a minute and half later, he again asked "So where'd you get the piece of razor from?"

*Id.*, 13:58. Baez responded by again nodding toward Snippert with his eyes still shut while saying, "I got it from him." *Id.*, 14:01. In response, Johnson stated: "Okay, that's twice"; "twice what" Baez asked; "that you lied," Johnson answered. *Id.*, 14:01-04. Baez, with eyes remaining shut, said nothing more. *Id.*

After his medical assessment was completed, he was taken to the infirmary psychiatric observation cell ("POC") and evaluated by POC staff for the next two days.

## IV.   Relevant Grievance History

### A.   Grievance No. 855779

On March 15, 2020, Baez filed Grievance No. 855779—the only grievance he filed that relates to the instant action. In this grievance, Baez began by describing the March 7, 2020, incident, and identified the compliance team as "c/o's wearing all black and shields [sic]." ECF No. 110-8, p. 2. Baez then introduced the March 8, 2020, incident, writing that "the following day, while having suicidal thoughts, I remember c/o Froelich would always give me razors, which I had hidden." *Id.* He proceeded to detail cutting himself and the subsequent events, as well as his relationship with Froelich. On March 16, 2020, the grievance was rejected "due to a failure to comply with the provisions of the DC-ADM 804, as specified" by the following "Rationale: DC-ADM 801 Inmate Discipline/Misconduct Procedures." *Id.*, p. 3.

Baez re-filed Grievance No. 855779 on March 18, 2020. The re-filed grievance similarly stated the allegations against Froelich but excluded the details of the March 7, 2020, incident. He writes:

> I became cool with **c/o Frolich** who works in the RHU, talking about sports and other things. So c/o Frolich started letting me use a razor while on a **PERMANENT RAZOR RESTRICTION**. **C/O Frolich** found out why I was in Jail, and said if he had 30 to 60 years he'll kill himself. So that week I aint get no razor. But the following week c/o Frolich gave me the razor and said you killed

7

> that poor old man, you should kill yourself. I took the razor out of the plastic and
> held it, and few other provoking incidents and I attempted suicide.

*Id.*, p. 4.  The relief portion of the grievance was nearly identical to the relief stated in the

rejected grievance:[4]

> Review all camera footage at razor passouts, back from January 2020 to March
> third on RHU pod B and the second week of March, **c/o Frolich** keep stopping at
> my cell asking me not to tell, check provoking incidents 3/7/2020 and 3/8/2020 I
> want compensation of my pain and suffering of the amount of **Twenty Five
> Thousand dollars cash!** The price is negotiable for settlement I need the copies
> of the permanent razor restriction status, and all camera footage requested and
> documents to be held for my lawyer and the court.

*Id.*  Along the right side of this grievance form, Baez added "(theres [sic] no other way I could

have got a razor)."  *Id.*

On April 7, 2020, an Initial Review Response ("IRR") denied Grievance No. 855779.

*Id.*, p. 5.  This IRR included a summary of the allegations against Froelich and an explanation for

the denial, including a recitation of the reviewing Grievance Officer's investigation into Baez's

claims and subsequent findings.  *Id.*

Baez appealed the IRR to the Facility Manager.  *Id.*, pp. 6-7.  This appeal was divided

into two subsections: *\*GRIEVANCE\** and **\*THE PROVOKING INCIDENTS**

**MENTIONED.\***  Under the **\*GRIEVANCE\*** header, Baez recited the portion of the initial

grievance copied above.  Beneath **\*THE PROVOKING INCIDENTS MENTIONED\*** header,

Baez detailed the March 7, 2020, incident as follows:

> I had a piece of paper on my window as I slept, I was told to removed [sic] it
> twice then I did it (my meds make me tired.) I did not by no means pose any
> threat at this time to myself or others, And I got sprayed with Phatom Four

---

[4] The rejected grievance sought relief as follows:
> For relief, Baez requests "to review camera footage at razor passouts, back from January 2020 to
> March 3nd [sic] on RHU B-Pod, and the second week the c/o kept stopping at my cell, asking me
> not to say nothing, the two provoking incidents on 3/7/20 and 3/8/20 . . . compensation for my
> pain and suffering of the amount of **'Twenty Five thousand dollars.'** . . . copies of the permanent
> razor restriction, and to review my mental health record.
ECF No. 110-8, p. 2.

> different times back to back with a very large amount. I was took out my cell to
> use the medical eye drops! then put in the same cell without the Phatom spray
> being clean, I was in that cell . . . . . . (8:00AM on 3/7/20 to the next day at 6:00
> p.m. on 3/8/20) is when I attempted suicide with the razor gave to me by c/o
> Frolick.

*Id.*, pp. 6-7. The relief requested was the same as the initial grievance form (printed above), with

the additional request "for c/o Froelich proof of a yearly razor pass (check log book)." *Id.*, p. 6.

On April 29, 2020, the Facility Manager Appeal Response rejected the grievance for the

same rationale as the IRR rejection. *Id.*, p. 8. This response summarized the grievance as

"grieving an incident/interaction with 'C/O Frolich' who works in the RHU" that "involved a

razor that you indicated he initially was permitting you to have, though was not allowed, and

ultimately he told you to 'kill yourself.'" *Id.*, p. 8. The Facility Manager rejected the appeal

after "review[ing] all the information," including the initial grievance form and IRR, and

concurred "with the Grievance Officer's rationale for denying [Baez's] grievance."[5] *Id.*[6]

On May 4, 2020, Baez submitted an Inmate Appeal to Final Review for

Grievance No. 855779. *Id.*, pp. 9-10. This final appeal was nearly identical to the appeal

to the Facility Manager and concluded:

> I took the razor out the plastic and held the razor, and again there was other
> **(PROVOKING INCIDENTS)** and I then attempted SUICIDE by cutting above

---

[5] Clark is referring to the rationale given in the IRR, wherein the Grievance Officer explains:
> I have reviewed your grievance, reviewed camera footage and spoke with staff. There is no
> camera footage available past March 2[nd]. So there is no footage to review. CO Froelich is not
> assigned as the CO that does razors on B-Pod. I have looked at all the razors that were issued and
> returned to the staff members and all of them had the blades in side the plastic. CO Froelich also
> stated that he never gave you a razor, nor did he tell you to kill yourself. Inmate Baez, you have a
> history of self harm, that is why you are on permanent razor restriction. No other staff member
> continually stopped at your cell to provoke you as well. You will not get any relief and your
> grievance is being denied.

ECF No. 110-8, p. 5.

[6] After summarizing the grievance allegations and rationale for upholding the denial of the grievance, the Facility
Manager writes "It should be noted that you bring up multiple additional issues that were not brought up at the time
of your initial grievance so they will not be addressed now." ECF No. 110-8, p. 8. The Facility Manager then
states, "The decision of the Facility Manager is to uphold the response of the Grievance Officer." *Id.*

my heart, this happen on 3/8/20 there is no other way I could of got a razor. I'm on 'RRL' and I don't leave my cell.

*Id.* **\*THE PROVOKING INCIDENTS MENTIONED\*** section began with the statement:

"THE PROVOKING INCIDENTS happen before the SUICIDE ATTEMPT!" *Id.*

The Secretary's Office of Inmate Grievances & Appeals ("SOIGA") dismissed Grievance 855779 on May 22, 2020, for "a failure to comply with the provisions of the DC-ADM 804," which requires that a "Grievance based upon different events must be presented separately." *Id.*, p. 11. The dismissal noted that the Chief Grievance Officer wrote, "Your appeal to this office addressed separate issues: 1. You had your cell window covered and were sprayed with OC. 2. PSS Lucas didn't help you following a suicide attempt. 3. CO Froelich's actions." *Id.*

V.    **Analysis**

A.    **Grievance #855779 properly exhausts the Eighth Amendment deliberate indifference claim but not the Eighth Amendment excessive force claim.**

Defendants first argue that Baez did not properly exhaust either his claim that Froelich violated his Eighth Amendment rights when he allegedly gave Baez a razor and encouraged him to commit suicide, or his claim that Bednoro used excessive force against him during the incident on March 7, 2020. Defendants are correct as to Baez's claim against Bednoro, but not his claim against Froelich.

"The Prison Litigation Reform Act of 1995 (PLRA) requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court." *Woodford v. Ngo*, 548 U.S. 81, 81 (2006). "Exhaustion is considered separately for each claim brought by an inmate, and if a complaint includes both exhausted and unexhausted claims, courts will dismiss the latter but not the former." *Shifflett v. Korszniak*, 934 F.3d 356, 364 (3d Cir. 2019) (citing *Jones v. Bock*, 549 U.S. 199, 219-20 (2007)). The failure of an inmate to exhaust

available administrative remedies is an affirmative defense that the defendant must plead and prove. *See Jones*, 549 U.S. at 216.

The Supreme Court has held that the PLRA requires "proper exhaustion," meaning "complet[ing] the administrative review process in accordance with the applicable procedural rules," *Woodford*, 548 U.S. at 88, which are supplied by the individual prisons, *Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). To determine whether exhaustion was proper, the court "evaluat[es] compliance with the prison's specific grievance procedures," which in Pennsylvania's state prison system are set out in DOC Policy DC-ADM 804, "and analyz[es] whether the procedures were 'available' to the inmate." *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010)) (citing *Small v. Camden County*, 728 F.3d 265, 269, 271 (3d Cir. 2013); 42 U.S.C. § 1997e(a)). The purpose of this stringent application of the exhaustion requirement is to alert the prison officials to a problem and allow the officials to remedy the problem before it is litigated in court; it is "not to provide personal notice to a particular official that he may be sued." *Williams v. Beard*, 482 F.3d 637, 640 (3d. Cir. 2007) (quoting *Jones*, 549 U.S. at 219 (quoting *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004))).

Defendants contend that Grievance No. 855779 did not properly exhaust Baez's Eighth Amendment deliberate indifference claim against Froelich because it was procedurally defective and that this grievance likewise did not exhaust Baez's Eighth Amendment excessive force claim against Bednoro because it "never mentioned Defendant Bednoro or any allegations against him." ECF No. 108.

To properly exhaust a claim, DC-ADM 804 requires an inmate to complete three stages: (1) initial review; (2) appeal; and (3) final review. *See* Grievance System Policy DC ADM-804; *Smith v. Sec. of Pa. Dept. of Corrections*, 2018 WL 279363, at *2 (W.D. Pa. Jan. 3, 2018). First, within fifteen days of the incident, the inmate must "legibly set forth all facts and identify all persons relevant to his claim in a grievance" submitted for review by the facility manager or the regional grievance coordinator, who, in turn, must respond in writing within fifteen business days. *Smith*, 2018 WL 279363, at *2 (citing *Spruill*, 372 F.3d at 233). Second, if the inmate disagrees with the response, he may appeal to the Facility Manager within fifteen working days; the Facility Manager then has fifteen working days to respond to the appeal. *See Jackson v. O'Brien*, 2021 WL 5087922, at *3 (W.D. Pa. Nov. 2, 2021). Finally, if the inmate remains dissatisfied, he has fifteen working days to appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"), which then must issue a final determination within thirty working days. *See Downey v. Pa. Dep't of Corrs.*, 968 F.3d 299, 305-06 (3d Cir. 2020).

Proper exhaustion extends to the substance of the grievance as well. Neither the PLRA nor DC-ADM 804 has a "name all defendants" requirement. *See Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 217); *Barclay v. Stabley*, 2021 WL 463651, at *4 (M.D. Pa. Feb. 9, 2021) ("There is no requirement in DC-ADM 804 that a prisoner must name the individuals that were involved"). But Section 11(d) of DC-ADM 804 mandates that the inmate "shall identify individuals directly involved in the events." *Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020). *See also* Jackson *v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020). Because the identification requirement is mandatory, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't*

*of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that [plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA").

The record for Grievance No. 855779 demonstrates that Baez followed the procedural steps dictated by DC-ADM 804. After his initial grievance form was rejected, he filed a new initial grievance that asserted the same allegations against Officer Froelich as the rejected grievance and included reference to "provoking incidents," although the details of the March 7, 2020, pepper spray incident were removed. ECF No. 110-8, at p. 4. The IRR understood this grievance to grieve the events associated with Officer Froelich, and rejected this grievance on the merits, as demonstrated by the Grievance Officer's summary of the grievance, investigation into its allegations, and rationale for denying it. Baez then timely appealed this rejection to the Facility Manager, and addressed the details of the March 7, 2020, incident as well as the mental health evaluation conducted after his March 8, 2020, self-harm incident. He then received a Facility Manager's Appeal Response, which similarly summarized the grievance as asserting claims against Froelich and upheld the denial of the grievance for the same assessment of its merits as stated in the IRR. Thereafter, Baez timely submitted a near identical appeal to SOIGA for final review, and SOIGA timely dismissed it. Baez therefore properly exhausted Grievance No. 855779. *See Small v. Camden Cnty.*, 728 F.3d 265, 272 (3d Cir. 2013) (citing *Spruill*, 372 F.3d at 231 (citing *Nyhuis v. Reno*, 204 F.3d 65, 77–78 (3d Cir. 2000) ("To "complete the administrative review process," we have held, means "substantial" compliance with the prison's grievance procedures."))).

Defendants nevertheless argue that SOIGA's procedural dismissal of the grievance renders it unexhausted. A careful review of the grievance record and DC-ADM 804 negates this

argument.  Pursuant to DC-ADM 804, only "[o]nce the inmate has complied with all of the procedural requirements and a grievance has received Initial Review," can the inmate then "file an Appeal from the Initial Review to the Superintendent of the inmate's respective Institution." ECF No. 110-10, Ex. K Declaration of Keri Moore.  *See also* ECF No 110-9, Ex. J DC-ADM 804, p. 10.  Likewise, an appeal must be "in accordance with this procedures manual," and is only reviewed on its merits if the Facility Manager concludes first that it is procedurally compliant.  ECF No. 110-8, p. 17.  An inmate is only able to file an appeal to SOIGA if they have successfully completed these first two steps.  *See* ECF No. 110-10; ECF No. 110-9, p. 19.

Here, Baez received an IRR denying his grievance on the merits.  Baez appealed this decision and received a Facility Manager's Appeal Response upholding the denial after an independent review of the grievance record led the Facility Manager to concur with the Grievance Officer's assessment of its merits.  The initial grievance and appeal were reviewed on the merits without issue and, thus, deemed procedurally sufficient by the reviewing officers. Baez then submitted a near identical appeal to SOIGA.  It follows then, that because Baez's appeal was procedurally sufficient, so was his appeal to SOIGA.  *See Rinaldi*, 904 F.3d at 270–71 ("In short, where the prison has chosen to forgo a rejection on procedural grounds and has elected to research, analyze, and deny a claim on the merits, both the purposes of exhaustion— and exhaustion itself—are satisfied.").

Consideration of the procedural deficiency cited by SOIGA adds further support to the Court's determination.  The reason given by SOIGA for dismissing Baez's grievance – that "different events must be presented separately" – is based on the DC-ADM 804 rule that "Any grievance based on separate events must be presented separately, *unless* it is necessary to combine the issues to support the claim."  ECF No. 110-8, p. 11; ECF No. 110-9, p. 7 (emphasis

14

added). As detailed above, the Appeal to Facility Manager and appeal to SOIGA are practically

indistinguishable in content and structure; and the accepted Initial Grievance Form, Appeal to

Facility Manager, and appeal to SOIGA recite the same allegations against Froelich and requests

for relief, and characterize the March 7, 2020, events as a provoking incident. The IRR and

Facility Manager's Appeal Response denied the grievance on the merits and, therefore, accepted

the presentation of events as necessary to support the claim against Froelich. This conclusion

aligns with Baez's distinction between the "grievance" and "provoking incidents," as well as his

description of the relationship between these events. Moreover, nothing in the DC-ADM 804 or

the grievance record would have put Baez on notice that he had to exclude certain events from

his grievance when appealing to SOIGA. Thus, Baez did not violate DC-ADM 804 or

procedurally default when he included closely related events in a single grievance. Raising both

the events and issues of March 7 and March 8 was necessary to support Baez's claim.

Finally, this conclusion is also consistent with the statutory purpose of the PLRA's

exhaustion requirement. This "requirement was intended to 'return control of the inmate

grievance process to prison administrators'; to 'encourage development of an administrative

record, and perhaps settlements, within the inmate grievance process'; and to 'reduce the burden

on the federal courts by erecting barriers to frivolous prisoner lawsuits.'" *Hardy v. Shaikh*, 959

F.3d 578, 586 (3d Cir. 2020) (quoting *Spruill*, 372 F.3d at 230). Consistent with this intent,

Baez's grievance "served its function of alerting the state and inviting corrective action." *Jones*,

549 U.S. at 205 (2007) (quoting *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004). *See also*

*Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004); *Williams v. Beard*, 482 F.3d 637, 640 (3rd

Cir. 2007). The IRR and the Facility Manager's Appeal Response summarized the grieved

allegations against Froelich and the prison's investigation into these allegations. As the Third

Circuit has stated, "just as 'prisoners [must] comply with the procedural demands of a system created by their jailors[,]' '[n]o less must prisons comply with the demands of the system they created'" and thus, "—we require 'strict compliance by prison officials with their own policies,'" or else the PLRA's benefits cannot be realized. *Hardy*, 959 F. 3d and 586 (quoting *Shifflett v. Korszniak*, 934 F.3d 356, 365, 367 (3d Cir. 2019)). Based on the foregoing, the Court concludes that Grievance No. 855779 properly exhausted Baez's Eighth Amendment deliberate indifference claim against Froelich in accordance with DC-ADM 804.

However, the Court finds that Grievance No. 855779 grieved only the claim against Froelich; it did not grieve the claim against Bednoro. First, the grievance does not name Bednoro. Section 11(d) of DC ADM 804 states that the inmate "shall identify individuals directly involved in the events." *See Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); *Jackson v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020). Because the identification requirement is mandatory, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that [plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA"). Baez's failure to identify Bednoro by name, however, does not conclusively establish noncompliance with §11(d) of DC ADM 804. Courts have found that inmates may adequately identify individuals in a grievance without using their names. For example, "[i]dentifying someone by position has been held to fulfill the DC-ADM 804's identification requirement." *Travillion v. Wetzel*, 765 Fed. Appx. 785, 789 (3d Cir. Apr. 8, 2019) (citing *Johnson v. Johnson*, 385 F.3d 503, 523 (5th Cir. 2004) (noting "a grievance can sufficiently identify a person even if

16

it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice)); *In v. Stroup*, 2021 WL 5922331, at \*5 (W.D. Pa. Dec. 15, 2021) (listing cases).  While Baez's grievance describes the events of March 7, 2020, it does not identify Bednoro by name, title, or description of function, or otherwise notify prison officials that Baez is challenging any action or omission of Bednoro. This is further confirmed by Baez's labeling of the section of the grievance discussing the events of March 7, 2020, as "provoking incidents," and his labeling of a separate section as "grievance," the latter of which addresses only the allegations against Froelich.  This structure and the absence of any reference to Bednoro conveyed to prison officials that Baez was grieving only the incidents associated with Froelich.  This effect is further evinced by the recitation and evaluation by the IRR and the Facility Manager's appeal response, which address the grievance as solely against Froelich.  Because the structure and substance of Grievance No. 855779 did not provide reasonable notice to prison officials that Baez was raising an Eighth Amendment excessive force claim against Bednoro, that claim was not exhausted by that grievance.

In summary, the Court finds that Grievance No 855779 properly exhausted the Eighth Amendment deliberate indifference claim against Froelich, but it did not properly exhaust the excessive force Eighth Amendment claim against Bednoro.  Accordingly, Bednoro is entitled to summary judgment as to this claim.

### B. Genuine issues of material fact preclude the entry of summary judgment on Baez's Eighth Amendment deliberate indifference claim against Froelich.

Froelich argues that the record does not support a finding that he acted with deliberate indifference to Baez's serious mental health needs.  The Court disagrees.

The Eighth Amendment imposes a duty on prison officials not only to provide "humane conditions of confinement," but to ensure that "reasonable measures" are taken to guarantee

17

inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834–35 (1994). An inmate may prevail on a claim under the Eighth Amendment by showing that the defendant acted with "deliberate indifference" to a "substantial risk of serious harm" to his health or safety. *Id.*, at 836.

To support an Eighth Amendment claim based on deliberate indifference to the risk of suicide or self-harm, the plaintiff must show that (1) the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) the prison official knew or should have known of the individual's particular vulnerability; and (3) the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017); *see also Colburn v. Upper Darby Twnshp.*, 838 F.2d 663 (3d Cir. 1988) (Colburn I), *Colburn v. Upper Darby Twnshp.*, 946 F.2d 1017 (3d Cir. 1991) (Colburn II); and *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005). *See also Easley v. Reuberg*, 2021 WL 3639734, at *4 (W.D. Pa. July 30, 2021), *report and recommendation adopted*, 2021 WL 3634813 (W.D. Pa. Aug. 17, 2021) (citation omitted). The "particular vulnerability" standard does not entail a heightened pleading requirement or a showing that "the plaintiff's suicide was temporally imminent or somehow clinically inevitable." *Palakovic*, 854 F.3d at 230. However, the vulnerability "must be so obvious that a lay person would easily recognize the necessity for preventative action." *Id.* at 222. *See also Reed v. City of Philadelphia*, 2021 WL 2529915, at *5 (E.D. Pa. June 17, 2021).

Here, Defendants do not dispute that there was a strong likelihood that Baez might attempt suicide and that Froelich knew or should have known that he was particularly vulnerable to suicide. Indeed, the record is replete with evidence of Baez's particular vulnerability to

18

suicide. *See e.g.*, ECF No. 119-1, pp. 2-24 (Baez' mental health records); ECF No. 120-1, pp. 3 (prison officials' intention to transfer Baez to the Behavioral Management Unit upon release from the RHU). In fact, SCI-Albion placed Baez on a permanent razor restriction because of his psychiatric diagnoses and propensity to self-harm. ECF No. 119-1, p. 25; ECF No. 110-8, p. 5 ("Inmate Baez, you have a history of self harm, that is why you are on a permanent razor restriction"). Froelich's awareness of Baez's vulnerability to suicide is further evidenced by the "permanent razor restriction door tag on" his RHU cell door and Froelich's position as a guard in the RHU. ECF No. 119, p. 2. Defendants contend, however, that the record is insufficient to show a genuine issue of material fact regarding Froelich's deliberate indifference to Baez's vulnerability to suicide.

In his verified complaint, Baez asserts that Froelich gave him a razor and encouraged him to commit suicide despite his knowledge of the permanent razor restriction imposed based on his mental health history. Baez's verified complaint serves as an affidavit for purposes of Defendants' motion for summary judgment. *See Reese v. Sparks*, 760 F.2d 64, 67 n. 3 (3d Cir.1985) (a verified pro se complaint may be treated as an affidavit for purposes of determining a defendant's summary judgment motion). Defendants argue that the record belies Baez's allegations because "[t]here is no mention of Defendant Froehlich throughout the investigation conducted as a result of Plaintiff's self-harm," nor in the POC's records between March 8, 2020 and March 10, 2020, concerning the evaluation of the self-harm incident. ECF No. 108. Defendants point out that Baez did not name Froelich as the guard who "provided him with a razor when specifically asked directly after the incident occurred," and that the only reason he provided for cutting himself was that he was stressed out. ECF No. 108. While Defendants' observations are correct, Froelich's absence from the POC records and Baez's recorded

19

comments is not conclusive evidence that Froelich did not provide the razor to Baez or encourage him to take his own life.  Because Baez's assertions in his verified complaint regarding his interactions with Froelich and Froelich's actions are based on Baez's personal knowledge, they are evidence the Court must consider in determining whether a genuine issue of material fact remains for trial.  *McShane Contracting Co. v. U. S. Fid. & Guar. Co.*, 61 F.R.D. 478, 480–81 (W.D. Pa. 1973) (explaining that "affidavits made on the basis of personal knowledge setting forth facts which would be admissible in evidence and showing affirmatively that affiant is competent to testify to the matters stated therein … are competent to raise genuine issues of fact").

To counter the assertions made in Baez's verified complaint, Defendants rely on Baez's statements in the medical department on March 8, 2020, as recorded by handheld video camera and upon the reports of the POC evaluators as memorialized in their records of March 8, 2020 through March 10, 2020.  As a preliminary matter, to the extent the POC reports are offered for their truth, they are hearsay and, thus, "can be considered on a motion for summary judgment" only "if they are capable of being admissible at trial."  *See e.g., FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (quoting *Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (emphasis added)) ("[T]he rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they *are capable of being admissible at trial*.").  Here, Defendants have not "explain[ed] the admissible form that is anticipated," and so the Court cannot consider the reports for their truth.  *Id.* (quoting Fed. R Civ. P. 56(c)(2)).

More importantly, the POC records and the summary judgment record in general do not resolve whether Froelich gave Baez a razor or encouraged him to commit suicide — facts material to the deliberate indifference claim.  Baez contends that he initially mistook and

incorrectly identified C.O. Snippert for Froelich because the officers "looked alike" and he "was under deep stress and ha[d] not slept in 24 hours due to [his] body being on fire from the March 7, 2020, OC spray." The Court cannot say as a matter of law that a reasonable jury could not accept Baez's explanation. He was sprayed with OC spray twice in two days and the record does not resolve whether his cell was thoroughly cleaned before he was returned to it on March 7, 2020. During the March 8, 2020, medical assessment recorded by the handheld camera, Baez appears physically and emotionally distressed, repeats that he is stressed out and in pain throughout this assessment, and is told by Capt. Johnson that he is lying when he identifies Snippert as the officer who gave him a razor. Additionally, As Baez states in his verified complaint and further evidenced in a misconduct report submitted by Baez as an exhibit, Froelich collected razors in Baez's section of the RHU (B-Pod) on April 23, 2020. ECF Nos 86; 95-1, p. 4. "At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter; rather, it determines whether or not there is a genuine issue for trial." *London v. Pa. Bd. of Prob. & Parole*, 135 F. Supp. 2d 612, 614 n. 4 (E.D. Pa. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party." *Id*. (citing Anderson, 477 U.S. at 255).

Because a reasonable jury could find that Froelich gave Baez a razor and verbally encouraged him to commit suicide and, if a jury were to so find, it also could find that Froelich acted with deliberate indifference to Baez's vulnerability for suicide, summary judgment in favor of Froehlich must be denied. *See Hill v. Wetzel*, 2022 WL 5422329, at *3 (3d Cir. Oct. 7, 2022) (nurse encouraging prisoner to commit suicide can constitute deliberate indifference) (citing

*Lisle v. Welborn*, 933 F.3d 705, 717 (7th Cir. 2019)); *Mullin v. Balicki*, 2019 WL 2315044, at *6 (D.N.J. May 31, 2019) (Prison officials actions, including encouraging the inmate to kill himself, supported claim for deliberate indifference); *Coit v. Luther*, 2021 WL 5792697, at *14-*15 (M.D. Pa. Dec. 7, 2021).

**VI.   Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 is granted in part and denied in part.  ECF No. 107.  The motion is DENIED as to the Eighth Amendment deliberate indifference to serious mental health needs claim asserted against Defendant Froelich.  The motion is GRANTED as to the Eighth Amendment excessive force claim asserted against Defendant Bednoro

DATED this 9th day of January, 2023.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE